JAMES WHITE v. THE BOARD OF SUPERVISORS OF MANISTEE COUNTY.

*Constitutional law—Police officer—Service of process—Constables—Fees.*

1. There is nothing in section 1, art. 11, of the Constitution, which provides for the election annually, in each organized township, of certain officers, to indicate that it was intended to embrace organized or incorporated cities and villages within the term "organized townships."

2. A police force is an organization having a controlling mind, by which its members may be made to act in concert, while

the constable acts upon his own responsibility and his own
conception of his legal duties; and the former, and not the
latter, is adapted to city government.

3. A provision of a city charter which makes it the duty of police-
men to serve and execute all process directed or delivered to
them for service, and for that purpose gives to them all
powers of constables, and which further provides that they
may serve and execute, within the limits of the city, any
other process which by law a constable may serve, is within
the power of the Legislature to enact.

4. *Mandamus* will lie to compel the payment, by the board of
supervisors of the county in which such city is located, of the
bill of a policeman for services rendered in the arrest of
persons charged with offenses against the laws of the State,
under warrants issued by justices of the peace.

5. The fact that the policeman has received his full pay from the
city for such services, without reporting on oath to the coun-
cil the amount of all moneys and fees received by him for
services as policeman, as required by the city charter, is no
defense to a valid claim against the county for such ser-
vices, the compensation for which is prescribed by law.

*Certiorari* to Manistee.   (McMahon, J.)   Argued April
16, 1895.   Decided June 4, 1895.

Relator applied for *mandamus* to compel respondent to
audit his claim for services rendered as policeman.   Re-
spondent brings *certiorari* from order granting the writ.
Affirmed.   The facts are stated in the opinion.

*Dovel & Smith*, for relator.

*F. E. Withey*, for respondent.

HOOKER, J.   The charter of the city of Manistee author-
izes the common council to provide by ordinance for a
police force, of such number of policemen as may be
necessary, to be appointed by the mayor, with the consent
of the common council.   Local Acts 1882, p. 53.   Section
4, chap. 12, of the charter fixes the powers and duties of
policemen as follows:

"It shall be the duty of the police and night watchmen and officers of the force, under the direction of the mayor and chief of police, and in conformity with the ordinances of the city, *to suppress all riots, disturbances, and breaches of the peace, and to pursue and arrest any person fleeing from justice* in any part of the State; *to apprehend any and all persons in the act* of committing any offense against the laws of the State or the ordinances of the city, and to take the offender forthwith before the proper court or magistrate, to be dealt with for the offense; to make complaint to the proper officers and magistrates of any person known or believed by them to be guilty of the violation of the ordinances of the city or the penal laws of the State, and at all times diligently and faithfully to enforce all such laws, ordinances, and regulations for the preservation of good order and the public welfare as the council may ordain, and to serve all process directed or delivered to them for service [services]; and for such purposes the chief of police and every policeman and night watchman shall have all powers of constable [constables], and may arrest upon view and without process any person in the act of violating any ordinance of the city or of committing any crime against the laws of the State. And the chief of police and any policeman may serve and execute all process in suits and proceedings for violations of [the] ordinances of the city, and also, within [with] the limits of the city, any other process which by law a constable may serve."

Section 5 provides:

"When employed in the service of process policemen shall receive the same fees therefor as are allowed to constables for like services; when otherwise engaged in the performance of police duty they shall receive such compensation therefor from the city as the council may prescribe. Every policeman shall report on oath to the council at its first meeting in every month the amount of all moneys and fees received by him for services as policeman since his last preceding report, and the names of the persons from whom received, and the amount received from each."

Section 31, chap. 7, of the charter provides:

"All fines recovered for the violations of the penal laws

of the State, when collected and paid into the city treasury, shall be disposed of as provided by law.  The expenses of prosecutions before justices of the peace of the city for violations of said criminal laws, and in punishing the offenders, shall be paid by the county in which the city is located."

By an ordinance of the city, enacted April 16, 1890, the pay of all the policemen of the city was fixed at $2 per day or night, less any fees received by them.

The relator was a regular policeman of said city, and at the expiration of his term filed a claim with the board of supervisors for services in the arrest of persons charged with offenses against the laws of the State, under warrants issued by justices of the peace, some, if not all, of which were upon complaint made by the relator.  The board refused to allow the claim.  From this record we conclude that no dispute exists over the facts, but that it is conceded that the services were rendered as alleged, and the sums charged are the statutory fees to which a constable would be entitled had he performed such services.  Upon behalf of the respondent the broad claim is made that constables are constitutional officers; that the duties and powers of constables are well settled by immemorial usage, in the light of which the Constitution was adopted; and that such officers can neither be abolished by the Legislature nor can they be divested of their powers, either directly or by conferring them upon others; and, further, that said officers are elective, and the public cannot be deprived of the right to have their duties performed by officers who are the choice of the locality, and that this right cannot be taken away by conferring the powers of the constable upon an appointed officer.

The constable is a township officer, and the only mention of such officer in the Constitution is in article 11, § 1, which enumerates and requires the election of township officers, including constables, not exceeding four. This same section expressly provides that the duties of

these officers shall be prescribed by law.   Upon this must
rest the contention that cities must have constables; that
the duties of the constables are fixed by immemorial
usage, and can be performed by no other person or officer;
and that they must be elected, and not appointed.

The Constitution (article 15, § 13) provides for the
incorporation and organization of cities and villages by
the Legislature.   By section 1, art. 11, every organized
township is required to have certain officers, but there
is nothing to indicate that it was intended to embrace
organized and incorporated cities and villages within the
term "organized townships."   These municipalities ex-
isted before the adoption of the Constitution; their pecul-
iar institutions, uses, and necessities were understood.
They were the creations of the Legislature, which had
been wont to grant powers and privileges to them, and
at the same time require the performance of certain
duties at their hands as State agencies.   It is singular
that article 11, § 1, did not provide that all organized
townships, cities, and villages should elect, etc., if it was
the design that cities and villages should be governed
by the same methods and officers as townships.   Again,
though the Constitution provides that cities shall be
represented upon the board of supervisors, it nowhere
provides that supervisors shall be elected by cities, and
in many instances mayors are performing that duty.
*Attorney General v. Preston*, 56 Mich. 177.   Some cities
have no clerk, the duties being performed by a recorder.
Numerous other officers and boards are provided, and, in
short, the whole scheme of local management is differ-
ent from that of townships.   All of these things are con-
sistent with the prevalent idea that municipal corpo-
rations are governed by such methods and officers as the
Legislature may provide (except where certain constitu-
tional officers have jurisdiction), and that they may be
radically different from those of *quasi* corporations, such
as townships.   The officers of cities and villages, what-
ever they may be, except judicial officers, may be ap-

pointed where the Legislature so directs (Const. art. 15, § 14), unless prohibited by section 1, art. 11; so that, if cities can be said to be within that section requiring the election of constables, such officers must be an exception to the general provisions of section 14, art. 15.   Here is another significant omission by the framers of the Constitution, if cities were supposed to be within article 11, § 1.   But, if the point be conceded, it does not follow necessarily that constables must be elected, unless we can say that the two provisions, considered together, should be so construed.

But this is not a case where the power or authority of a constable is involved; it is the power of the Legislature to confer upon other officers some of the authority which is within the range of a constable's duty.   We are asked to say that the power to serve justices' warrants, issued upon criminal charges, cannot be exercised by appointed police officers, and the reason given is that it would be trenching upon the constitutional powers of constables.   This involves the contention that the city must employ constables instead of police, or, if not, its officers must limit their operations to the confines of the city, giving up the chase of offenders at city lines, or calling upon a qualified constable to serve the judicial writ when the act is made an offense by general law.   This is said to be necessary because the constable has the right to serve, and the public to be served by a constitutional officer elected by the people, whose duties and powers by virtue of immemorial usage are   inviolate, against even the Constitution, which expressly provides that they may be fixed by law.   The case of *Allor v. Board of Auditors*, 43 Mich. 76, is cited as a case sustaining this contention; but, while that case vindicates the right of a Detroit constable to fees for serving criminal process, it nowhere says that his right to perform the duties of his office is exclusive.   On the contrary, that case recognizes the fact that cities may need a more efficient method of preserving the peace and protecting

society than constables could afford.  A police force is
an organization; it has a controlling mind, by which its
members may be made to act in concert; while the con-
stable acts upon his own responsibility and his own con-
ception of his legal duties.    It needs no argument to
show that the former, and not the latter, is adapted to
city government.   In the case cited, Mr. Justice CAMP-
BELL says that the police act does not deprive constables
in the city of their power to serve process, but he nowhere
intimates that members of the police force may not do the
same.   On the contrary, he recognizes the power of the
Legislature to provide additional officers, who may be
conservators of the peace, which is as important a func-
tion of the constable as the power to serve a warrant.  He
says:

"There can be no complete city corporation without
means of enforcing such regulations as are necessary for
the peace and good order of the community, and this
can only be done by the aid of officers.   A great majority
of the regulations needed to prevent confusion in cities
*lie entirely outside of criminal law,* and authorize inter-
ference of an official character where no arrest would be
lawful; and in many of these cases it is not uncommon
for quarrels to arise which go far enough to create
breaches of the peace, when it would be very dangerous
if the municipal officer must at that point stop short in
the performance of his civil duty, and call to his aid a
different officer.    Until the police act of Detroit was
passed, there was not a single place in the State where
these functions were not united, and the police act itself
attempts to unite them, not by giving city officers func-
tions under State law, but by giving State officers func-
tions under municipal regulations, and depriving munic-
ipal officers of municipal powers.    We can hardly believe
that when the police system was adopted, in 1865, the
Legislature had any idea that they were doing more than
adding desirable auxiliaries to municipal authority.    It
is not to be supposed they meant to revolutionize our
institutions by superseding local by central authority.
The police force is nothing more nor less, so far as it is
lawfully constituted, *than an additional force of constables
and watchmen appointed by the State for certain limited*

*purposes;* and unless some power exists in the Legislature, not only to add to the force of local peace officers, but to supersede them entirely for all common-law purposes, the provisions complained of in this statute cannot be maintained, if they are to be construed as respondents construe them."

We are referred to the cases of *Abels v. Board of Supervisors,* 42 Mich. 526, and *Ames v. Booming Co.,* 11 Id. 139. The former case attempted to give voluntary associations for the prevention of horse thieving the power to apprehend felons, and to confer upon their members the rights, privileges, and protection of constables while so engaged. It was held that the law was invalid. These cases call for no extended discussion. It cannot be said that a police officer, appointed in pursuance of law, is on the same footing as private persons who, for gain, associate to perform public duty by attempting to enforce the criminal laws of the State.

It is contended that the claim should not be enforced against the county, because it is due to the city of Manistee, if to anybody, and that the relator has received his full pay from the city, without reporting the amount due him for these fees. On the other hand, it is contended that the fees are given to the officer by law, and that the city has no right to them, though it has overpaid relator, according to the terms of the contract. This is a question that does not concern the respondent, and is therefore no defense to a valid claim against the county for services rendered, compensation for which is prescribed by law.

The order of the circuit court will be affirmed, with costs.

The other Justices concurred.